No. 24-60516

# In the United States Court of Appeals for the Fifth Circuit

STARBUCKS CORPORATION,

*Petitioner/Cross-Respondent,*

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner.*

*On appeal from a decision of the National Labor Relations Board, No. 21-CA-294571*

## BRIEF OF PETITIONER/CROSS-RESPONDENT STARBUCKS CORPORATION

JEFFREY S. HILLER
LITTLER MENDELSON, P.C.
  *41 S. High St., Ste. 3250*
  *Columbus, OH 43215*

JONATHAN O. LEVINE
LITTLER MENDELSON, P.C.
  *1111 E. Kilbourn Ave., Ste. 1000*
  *Milwaukee, WI 53202*

LISA S. BLATT
AMY MASON SAHARIA
TYLER BECKER
ALEXA DEN HERDER
WILLIAMS & CONNOLLY LLP
  *680 Maine Avenue, S.W.*
  *Washington, DC 20024*
  *(202) 434-5000*
  *lblatt@wc.com*

*Counsel for Petitioner/Cross-Respondent*

## CERTIFICATE OF INTERESTED PERSONS

### Case No. 24-60516

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

**Petitioner/Cross-Respondent:**

- Starbucks Corporation

**Respondent/Cross-Petitioner:**

- National Labor Relations Board

**Intervenor:**

- Workers United, affiliated with the Service Employees International Union

**Counsel for Petitioner/Cross-Respondent:**

- Lisa S. Blatt
  Amy Mason Saharia
  Tyler Becker
  Alexa Den Herder
  Williams & Connolly LLP
  680 Maine Avenue, S.W.
  Washington, DC 20024
  (202) 434-5000
  lblatt@wc.com
  asaharia@wc.com
  tbecker@wc.com
  adenherder@wc.com
- Jeffrey S. Hiller
  Littler Mendelson, P.C.
  41 S. High St., Ste. 3250

i

Columbus, OH 43215
(614) 463-4230
jhiller@littler.com

- Jonathan O. Levine
  Littler Mendelson, P.C.
  1111 E. Kilbourn Ave., Ste. 1000
  Milwaukee, WI 53202
  (414) 291-5537
  jlevine@littler.com

**Counsel for Respondent/Cross-Petitioner:**

- Ruth E. Burdick
  Micah Prieb Stoltfus Jost
  Kira Dellinger Vol
  National Labor Relations Board
  1015 Half Street, SE
  Washington, DC 20570
  (202) 273-2960
  appellatecourt@nlrb.gov
  micah.jost@nlrb.gov
  kira.vol@nlrb.gov

**Counsel for Intervenor:**

- Dmitri L. Iglitzin
  Gabriel Frumkin
  Barnard Iglitzin & Lavitt, LLP
  18 W. Mercer St., Ste. 400
  Seattle, WA 98119
  (206) 257-6038
  iglitzin@workerlaw.com
  frumkin@workerlaw.com

Counsel further certifies that Starbucks Corporation has no parent company and that no public company owns 10% or more of its shares.

/s/ Lisa S. Blatt
L<small>ISA</small> S. B<small>LATT</small>
*Attorney of Record for*
*Petitioner/Cross-Respondent*

## STATEMENT REGARDING ORAL ARGUMENT

Respondent Starbucks Corporation requests oral argument pursuant to Fifth Circuit Rule 28.2.3. This case presents significant questions regarding employers' First Amendment right to speak with employees about unionization, including whether the National Labor Relations Board's purely objective standard for evaluating employer speech violates the First Amendment. Oral argument will assist the Court in resolving these important issues.

# TABLE OF CONTENTS

Page

JURISDICTIONAL STATEMENT ..................................................................1

STATEMENT OF THE ISSUES ....................................................................1

INTRODUCTION ..........................................................................................2

STATEMENT OF THE CASE ........................................................................6

    A.    Factual History ..........................................................................6

    B.    Procedural History ...................................................................16

SUMMARY OF ARGUMENT.......................................................................20

STANDARD OF REVIEW ............................................................................22

ARGUMENT ................................................................................................24

I.    The Board Applied Incorrect Legal Standards that
Unconstitutionally Restrict Employers' Protected Speech ..................24

    A.    Subjective Awareness of the Threatening Nature of Speech
Is Required To Impose Liability....................................................24

    B.    Subjective Evidence Is At Least Relevant to Whether
Employer Speech Tends To Coerce ..............................................29

II.    Schultz's Statement Was Not an Unlawful Threat of Reprisal ............34

    A.    A Reasonable Employee Would Not Consider Schultz's
Statement a Threat of Reprisal.....................................................34

    B.    The Subjective Evidence Confirms That No Threat of
Reprisal Occurred .......................................................................43

    C.    No Evidence Proved That Schultz Had a Culpable Mindset.......47

CONCLUSION.............................................................................................48

# TABLE OF AUTHORITIES

Page

## CASES

*AutoNation, Inc. v. NLRB*, 801 F.3d 767 (7th Cir. 2015) .................................35

*Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485 (1984) ................23

*Brown & Root, Inc. v. NLRB*, 333 F.3d 628 (5th Cir. 2003) .................23, 29, 30

*Chamber of Commerce of the U.S. v. Brown*, 554 U.S. 60 (2008) ............ *passim*

*Chromalloy Min. & Mins. Alaska Div., Chromalloy Am. Corp. v.
    NLRB*, 620 F.2d 1120 (5th Cir. 1980) ..............................................................33

*Citizens Publ'g & Printing Co. v. NLRB*, 263 F.3d 224 (3d Cir. 2001) .............1

*Counterman v. Colorado*, 600 U.S. 66 (2023) ............................................ *passim*

*Crown Cork & Seal Co. v. NLRB*, 36 F.3d 1130 (D.C. Cir. 1994) ....................35

*Delco-Remy Div. v. NLRB*, 596 F.2d 1295 (5th Cir. 1979) ...............................41

*Dresser-Rand Co. v. NLRB*, 838 F.3d 512 (5th Cir. 2016) ...............................22

*DTR Indus. v. NLRB*, 39 F.3d 106 (6th Cir. 1994) ...........................................24

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades
    Council*, 485 U.S. 568 (1988) ....................................................................23, 30

*Exxon Rsch. & Eng'g Co. v. NLRB*, 89 F.3d 228 (5th Cir. 1996) ...............36, 41

*FDRLST Media v. NLRB*, 35 F.4th 108 (3d Cir. 2022) ............................. *passim*

*Federal-Mogul Corp. v. NLRB*, 566 F.2d 1245 (5th Cir. 1978) .......................32

*Hendrickson USA, LLC v. NLRB*, 932 F.3d 465 (6th Cir. 2019) ......................30

*Linn v. United Plant Guard Workers*, 383 U.S. 53 (1966) ...................26, 28, 41

*NLRB v. Amoco Chemicals Corp.*, 529 F.2d 427 (5th Cir. 1976) .....................33

*NLRB v. Bogart Sportswear Mfg. Co.*, 485 F.2d 1203 (5th Cir. 1973) ............35

*NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969) ................................... *passim*

*NLRB v. Kaiser Agricultural Chemicals, Division of Kaiser
    Aluminum & Chemical Corp.*, 473 F.2d 374 (5th Cir. 1973) .......................33

*Quickway Transportation, Inc. v. NLRB*, 117 F.4th 789 (6th Cir. 2024).......35

*Renew Home Health v. NLRB*, 95 F.4th 231 (5th Cir. 2024) .....................31, 32

*Snyder v. Phelps*, 562 U.S. 443 (2011) .............................................................23

*Speiser v. Randall*, 357 U.S. 513 (1958) ..........................................................27

*Starbucks Corp. v. McKinney*, 602 U.S. 339 (2024)........................................17

*Starbucks Corp. v. NLRB*, 373 NLRB No. 33 (2024) .......................................43

*Sunbelt Rentals, Inc.*, 372 NLRB No. 24 (2022) ..............................................41

*Thryv, Inc. v. NLRB*, 102 F.4th 727 (5th Cir. 2024) ........................................25

*Trinity Servs. Grp., Inc. v. NLRB*, 998 F.3d 978 (D.C. Cir. 2021) ............25, 40

Page

Cases—continued:

*Tschiggfrie Props., Ltd. v. NLRB*, 896 F.3d 880 (8th Cir. 2018)...............24, 41
*Valmont Indus., Inc. v. NLRB*, 244 F.3d 454 (5th Cir. 2001) .........................23

## CONSTITUTION, STATUTES, AND REGULATIONS

U.S. Const. amend. I.................................................................................*passim*
5 U.S.C. § 706 ...........................................................................................23
29 U.S.C.
  § 158............................................................................................2, 7, 25, 28
  § 160...........................................................................................1, 17, 23, 24
29 C.F.R. §§ 101.10-.12.............................................................................17

## OTHER AUTHORITIES

*Threat*, Black's Law Dictionary (12th ed. 2004)..................................35
Howard Schultz, *Statement Before the Senate Committee on Health,
  Education, Labor, and Pensions* (Mar. 29, 2023),
  https://tinyurl.com/ydh7phk7 ................................................................6, 7
Starbucks, *Starbucks Raises the Bar with Industry-Leading
  Employee Benefits, Outperforming Competitors* (Nov. 6, 2023),
  https://tinyurl.com/43m6v2r2 .........................................................6

## JURISDICTIONAL STATEMENT

The Board issued its Decision and Order on October 2, 2024. Starbucks petitioned for this Court's review on October 8, 2024. The Board applied for enforcement of its Decision and Order on October 30, 2024. This Court has jurisdiction because the Decision and Order is a final order, and venue is proper in this Circuit because Starbucks transacts business within this Circuit. *See* 29 U.S.C. §§ 160(e), (f). The petitions and cross-application are timely because the NLRA imposes no time limit for such filings. *See, e.g.*, *Citizens Publ'g & Printing Co. v. NLRB*, 263 F.3d 224, 232 (3d Cir. 2001).

## STATEMENT OF THE ISSUES

I.    Whether the First Amendment requires the National Labor Relations Board (NLRB) to prove an employer's subjective awareness of the threatening nature of its speech to impose liability under Section 8(a)(1) of the National Labor Relations Act (NLRA), or, alternatively, whether subjective evidence of an employer's intent and employees' understanding is relevant to whether speech unlawfully threatens reprisal under Section 8(a)(1).

2.    Whether the NLRB erred in holding, in violation of the First Amendment and Section 8(c), that a Starbucks executive threatened reprisal and thus violated Section 8(a)(1) where (a) the Board applied a per se rule

based on the statement's content without taking account of all the surrounding circumstances, and (b) the Board declined to consider that no employee felt threatened and that no evidence showed that the executive intended to threaten reprisal or was aware that his statements threatened reprisal.

## INTRODUCTION

The First Amendment protects employers' right to discuss unionization with their employees.  Congress enshrined that protection in Section 8(c) of the NLRA, making clear its intention to foster "uninhibited, robust, and wide-open debate in labor disputes." *Chamber of Commerce of the U.S. v. Brown*, 554 U.S. 60, 68 (2008) (citation omitted); 29 U.S.C. § 158(c).

The National Labor Relations Board's over-policing of conversations between employers and employees, like the one at issue here, squelches such debate.  The Board has unlawfully turned the NLRA into a mechanism for punishing employers for offhand remarks—here, a rhetorical comment during an honest discussion of Starbucks' benefits.  If supervisors or executives cannot respond in the moment and in good faith without fearing that the Board will turn an off-the-cuff answer into an unfair labor practice, then employee speech in favor of unionization will flood the zone and employers will have no choice but to stay silent, even when pro-union employees seek to hijack

conversations in the hopes of goading their supervisors or company executives into supposed unfair labor practices.

Starbucks "has a history of seeking employee input on how to improve the company."  RE8.  This case arises from a single comment by Starbucks interim CEO Howard Schultz during a three-hour collaboration session with a small group of employees (which Starbucks calls "partners") in California. The purpose of that session was for partners to share their ideas and plan for the future of Starbucks.  At the beginning of the session, Schultz encouraged partners to "speak the truth" and assured them they would not "get in trouble" for doing so.

One partner prepared and sought to commandeer the session as a platform to berate Schultz about benefits and union charges.  Schultz tried to steer the conversation to the historic and intended purpose of Starbucks collaboration sessions—how to improve Starbucks' future for all partners— and offered to speak to the partner one on one about unionization.  But the partner persisted.  In response to the partner's continued sarcasm and rhetoric, Schultz made his own rhetorical point, "[I]f you're not happy at Starbucks, you can go work for another company."  Later in the same conversation, he expressly reaffirmed partners' right to unionize.

The comment did not chill the partner's unionization efforts: the partner continued to express their opinions in the session, and immediately after and outside the building where the session occurred, the partner advocated for unionization and distributed union-related information. The partner continued their union activity and employment with Starbucks thereafter without experiencing any adverse action.

Against this non-coercive context, the Board nonetheless deemed Schultz's statement a "coercive threat" in violation of Section 8(a)(1) of the NLRA, and punished the statement as an unfair labor practice.

That decision is legally untenable. The Board erred in holding that Starbucks threatened reprisal. As an initial matter, Schultz' statement was not a threat, let alone an objectively coercive threat. But the Board also applied the wrong legal test. In *Counterman v. Colorado*, 600 U.S. 66, 73 (2023), the Supreme Court held that threatening speech cannot be punished unless the speaker is subjectively aware that the speech is threatening. A purely objective test, the Court reasoned, unconstitutionally chills protected speech. This case illustrates the wisdom of that holding. When the Board turns off-the-cuff employer statements into unfair labor practices—even when employers in the very same conversation forswear retaliation and affirm

employees' right to unionize—it chills future employer speech about unionization. *Counterman*'s subjective-awareness requirement should apply with full force in the NLRA context.

But even if *Counterman* does not apply, an employer's subjective intent and employees' subjective reactions are at least relevant to whether speech objectively tends to coerce. That the partner proceeded to advocate unionization immediately after the at-issue conversation is surely probative of whether reasonable employees would have understood whether Schultz was threatening reprisal. But the Board ignored all subjective evidence.

Even viewing only the objective evidence, the Board's conclusion that Schultz threatened reprisal cannot stand. The conversation—memorialized on video—was a healthy, robust debate between two people who felt strongly about their views, and in no way contained the evil-for-evil threat of reprisal that the NLRA and the First Amendment require to impose liability. But the Board ignored that evidence. Instead, the Board (1) improperly dismissed Schultz's promise not to retaliate; (2) treated Schultz's *truthful* comment that the employee seemed angry as coercive; and (3) buttressed its otherwise baseless conclusion of reprisal with a "backdrop" of unproven and unidentified allegations that Starbucks had anti-union animus. RE2. That was error.

The Court should grant Starbucks' petition, set aside the Board's order, and deny the Board's petition for enforcement.

## STATEMENT OF THE CASE

### A.    Factual History

1. Starbucks is America's largest coffee purveyor.  At Starbucks, the secret ingredient is not the coffee—it is the baristas.  That is why, in 1991, then-Starbucks CEO Howard Schultz introduced a groundbreaking stock program that turned employees into "partners."  Since then, Starbucks has become known for its history of collaborating with its partners and providing the best and most innovative benefits across the nation for hourly retail work.

In the United States alone, Starbucks employs some 235,000 partners, each of whom has an ownership stake in the success of the business. Starbucks, *Starbucks Raises the Bar with Industry-Leading Employee Benefits, Outperforming Competitors* (Nov. 6, 2023), https://tinyurl.com/43m6v2r2.  Starbucks promotes many baristas to management and pays up to 100% of their college tuition.  Howard Schultz, *Statement Before the Senate Committee on Health, Education, Labor, and Pensions* 2 (Mar. 29, 2023), https://tinyurl.com/ydh7phk7.  And Starbucks offers "industry-leading benefits," ranging from comprehensive health care

6

and stock ownership to student loan assistance, paid sick leave, and backup child care. *Id.*

When Schultz returned to Starbucks as interim CEO in 2022, he promised to uphold that same culture. Schultz vowed to "spend lots of time with partners," "[t]o lift up voices," and to "create a positive impact in the world." Exceptions Br. 9. Schultz also affirmed partners' right to organize under the NLRA. ROA.663:25, 664:1.

Starbucks respects its partners' right to organize under the NLRA. The NLRA in turn protects both employers' and employees' First Amendment right to "express[] … any views, argument, or opinion" in any form, which "shall not constitute or be evidence of an unfair labor practice … if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). Under the NLRA, only speech that involves "a threat of retaliation based on misrepresentation and coercion" is forbidden. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969).

2. This case involves a single sentence by Howard Schultz in a conversation with partner Madison Hall during a collaboration session with a

7

small group of partners.  The conversation was video-recorded, and the recording is in the Court's files.[1]  We urge the Court to watch it.

On April 4, 2022, Schultz returned to the role of interim CEO of Starbucks.  ROA.720.  Upon his return, Schultz promised to "spend lots of time with partners," "[t]o face challenges" with them, and to "become accountable for building the future of our company."  Exceptions Br. 9.  Schultz also expressly emphasized the right of partners to organize under the NLRA, and disclaimed that Starbucks was "anti-union."  ROA.497, 706:6.

During his first week back, Schultz and other Starbucks leaders held collaboration sessions with partners in several cities.  ROA.196-98, 718-19.  The collaboration sessions were by invitation only and were completely voluntary.  ROA.301:20-22, 721 ¶ 17.  The invitation stated that the purpose of the collaboration session was to "plan for the future of Starbucks" and for partners to share their "ideas and thought partnership" with Starbucks.  ROA.673.

---

[1] A transcript of the conversation between Hall and Schultz is at ROA.651-669.  A video of the session is on a USB drive that the Board submitted to the Court, which the Court filed on November 26, 2024.  ROA.670; ECF No. 48.

Starbucks scheduled a collaboration session in Long Beach, California, and invited approximately 16 hourly partners from area stores, including partner Madison Hall.[2]  ROA.721 ¶ 17.  Starbucks invited Hall because they were "outspoken" and "good at voicing ideas."  ROA.196:23-25, 197:1-8, 304:13-15.  Hall was involved in union organizing at the time, but, as the Administrative Law Judge (ALJ) found, "there is no evidence that [Starbucks] was aware of that."  RE5.

In preparation for the collaboration session, Hall created a binder of notes relating to NLRB cases involving Starbucks.[3]  ROA.67:19-22, 308:7-24, 309:1-3.  Hall anticipated that Schultz would be at the collaboration session, and planned to use the notes to challenge Schultz and to get him to comment on pending NLRB matters.  ROA.67:21-22.

3.  On April 8, 2022, Starbucks held the Long Beach collaboration session at a private meeting space.  ROA.720 ¶ 15.  A private consultant moderated the session.  ROA.720 ¶ 12.  The session began with snacks, a coffee tasting, and a video of an open forum that Schultz held on April 4 entitled "Our Best

---

[2] Hall's preferred pronouns are "they/them/their."

[3] By the time of the hearing in this case, Hall had destroyed the binder. ROA.68:3-4, 149:12-14, 515.

Days are Ahead."  ROA.68:10-20, 330:3-5; RE5.  In the video, Schultz assured partners that he was "not an anti-union person" but was instead "pro-Starbucks, pro-partner, pro-Starbucks culture, pro-heritage."  ROA. 706:7-9.  He added that he wanted "the collective we" to "reimagine a new Starbucks with our partners at the center of it all as a "pro-partner company" "that does not need someone in between us and our people."  ROA. 706:20-22.  The Board did not find this video to coerce or threaten in any way.  After the video, Schultz entered the room and sat down with the partners.  ROA.74:3-4.

The partners introduced themselves to Schultz, "stating their name, job position, store location, and tenure" with Starbucks.  ROA.74:23-25.  During the introductions, Schultz emphasized the open nature of the collaboration session and shared that it was an opportunity for partners to "speak the truth."  ROA.646:1.  Schultz expressly assured the partners that "[t]here will be no retribution" against them for speaking their thoughts and that "no one's going to get in trouble" for speaking up because Starbucks wanted the partners' input and participation.  ROA.646:1-4.

After introductions, the partners had the opportunity to participate in two voluntary exercises.  The first exercise invited partners to write statements regarding their experience at Starbucks on a poster.  ROA.722

10

¶ 25; RE5. None of the statements the partners wrote referred to unions or organizing in general. RE5. Partners then read the different statements and spoke about those that resonated with them. *Id.*

The second exercise involved four posters. RE5. Each poster posed a question: (1) What's one thing Starbucks can do that would make you even more proud to be a partner?; (2) What can we dream up next to be a different kind of company?; (3) How might we build together?; and (4) What's the one thing we could do to rebuild trust in the company? *Id.* The partners wrote their responses to the questions on Post-it notes and placed them on the respective posters. *Id.*

Hall voluntarily wrote statements on Post-it notes and placed them on the posters. RE5. Most of Hall's Post-it notes referenced unions. ROA.86:19-25, 87:20-21, 88:6, 462-468; RE5. None of the Post-it notes from other partners mentioned unions, instead addressing a range of topics, from the environment and sustainability to store operations. ROA.462-468, 723 ¶¶ 27-30. After the Post-it notes were placed on the posters, the partners placed a green dot sticker next to the Post-it notes that resonated with them. ROA.85, 343:10-12, 462-468.

The entire exercise was voluntary.  The partners "were free to place green dots wherever they chose and free to refrain from affixing any green dots at all."  RE6.  Unless a partner self-identified as the drafter of a Post-it note, which Hall did not, it was unknown who drafted each note.  ROA.319:2-4, 320:2-7, 328:5-7.

4.  After the exercises, the moderator asked the partners if they wished to discuss any of the Post-it notes.  RE6.  Hall commented that partners should be able to afford to live in the city where they work.  *Id.*  Schultz, sitting a few feet away, agreed.  ROA.650-51, 670.  Hall then transitioned to the subject of benefits, asserting that competitors had similar or better benefits than Starbucks.  ROA.650:21-25, 651:1-3; RE6.  Schultz responded by describing Starbucks' history of providing industry-leading benefits, which included health care, ownership, and educational benefits.  ROA.651:8-11, 13-17, 21-25, 652:1-12.  Schultz again agreed that partners should be paid enough to live in the city where they work, but added "that profit allows Starbucks to create opportunities for everyone."  ROA.653:7-8.

Hall was visibly annoyed by Schultz's response.  ROA.225:5-25, 670. Schultz observed Hall's reaction and respectfully said, "I sense from you a little bit of anger towards the company, and I just want to know why.  Why are

you angry at Starbucks?"  ROA.654:12-14.  Hall sarcastically replied, "God, I mean, I don't know how much time I have.  But I mean, we can start with the NLRB charges that are currently open."  ROA.654:15-17.  Schultz tried to redirect the discussion to the purpose of the meeting by stating, "I don't think this is the place."  He added that he would be "happy to talk" to Hall about NLRB matters "one on one."[4]  ROA.670 at 5:49-51; RE6.

Dissatisfied with that response, Hall said, "So one thing that we could do to rebuild trust in the company, I think that transparency and honesty from you is what we need.  Are you willing to be honest with us?"  ROA.654:25, 655:1-2.  Schultz replied:

> I'm here to be 100 percent honest and transparent.  You've been with the company two years.  I would just ask you to have a little bit more respect for the people who have been here more … years than you.  And the fact that I've come here, not to talk about a union issue, I've come here to address the issues that we need to address to improve the company.  And if you're not happy at Starbucks, you can go work for another company.

ROA.655:7-13.  Hall nodded and said, "Okay," while another partner expressed that, in his view, the purpose of the collaboration session was "a

---

[4] The transcript of the conversation between Hall and Schultz does not pick up this interaction, but it is audible in the video, ROA.670 at 5:49-51, and the ALJ found that the interaction occurred.  RE6.

desire to be better, not just the company, but as a group." ROA.655:22-23. Schultz agreed, "One hundred percent. We never want to settle." ROA.656:4-5.

After that interaction, the moderator facilitated a discussion about the common goals the partners had for Starbucks and their stores. The moderator expressed the importance of having a "sense of we" in the dialogue, and asked the group "if that makes sense." ROA.657:17-20. Hall responded, "Yeah. Absolutely." ROA.657:21. The moderator then complimented Hall for "coming from a place of care" and invited Hall to talk briefly about what they liked about their Starbucks experience. ROA.657:22-25, 658:1-4.

Hall explained that they loved their co-workers, coffee, the idea of Starbucks, and Starbucks' mission and values. ROA.658:14-16. But Hall quickly switched back to the subject of unions, and asked Schultz, "[D]o you know what is on, the unfair labor practices?" ROA.658:18-19. Schultz responded that he was not going to discuss the topic, ROA.658:20-21, but Hall continued that Starbucks' position on unions lacked authenticity and transparency. ROA.659:8-21.

Next, another Starbucks officer asked Schultz to address Hall's "great questions." ROA.662:15-21. Schultz started by apologizing that the

collaboration session had shifted to a topic he had not planned to discuss, and then described a very "troubling" and "emotional" experience during a recent visit to Chicago.  ROA.662:24-25, 663:1-4, 6-25.  During a memorial service for a partner who was recently murdered, a non-employee union organizer entered the Starbucks roastery where the service was being held and started screaming, disrupting the service, and upsetting the family and others in attendance.  *Id.*  Schultz remarked that the collaboration session "is not the place to debate or argue whether someone has the right to organize, *which they do*."  ROA.663:24-25, 664:1 (emphasis added).

At the end of the session, Schultz thanked the partners for their ideas and stated that he was going to "promote" the partners' ideas.  ROA.667:4-10. The partners also shared stories about how working at Starbucks had changed their lives.  ROA.236:24-25.  Some even stayed and took pictures with Schultz. ROA.228:15-21.

During the collaboration session, no Starbucks representative asked any partner "about their union activities, the union activities of others, or any union-related topics placed on any of the posters."  RE6.  Partners were "free to participate or refrain from participating in the activities" and were also

"free to leave the room or the session at any time." *Id*. In total, the collaboration session lasted approximately 2.5 to 2.75 hours. *Id*.

5. After the session, there was a gathering of pro-union individuals outside. ROA.229:1-4, 232:13-15. Hall joined the group and distributed information about unionization. At the ALJ hearing, Hall admitted to using social media during the bathroom break to tell others that Schultz was at the collaboration session. ROA.233:25, 234:1-5. Hall created two videos about the session and their interaction with Schultz that were later posted on the Union's TikTok page. ROA.153:13-21, 154:3-23.

No evidence showed that Hall experienced or reported any form of retaliation after the collaboration session. Hall continued their employment with Starbucks and attempted to organize their store. ROA.63:3-7. Hall did not leave Starbucks until July 2022, weeks after Hall's store voted against unionizing. ROA.61:16-23, 182:14-16.

## B.    Procedural History

1. On April 21, 2022, Workers United filed charges against Starbucks with the NLRB. ROA.354. It amended the charges in June 2022. ROA. 368. Workers United alleged that Starbucks violated Section 8(a)(1) of the NLRA by threatening, interrogating, and polling employees at the Long Beach

16

collaboration session. *Id.* In October 2022, the NLRB's Regional Director issued a complaint, initiating administrative proceedings. *See generally Starbucks Corp. v. McKinney*, 602 U.S. 339, 342-43 (2024); 29 U.S.C. §§ 160(b), (c); 29 C.F.R. §§ 101.10-.12.

2. After a three-day hearing in early 2022, an ALJ issued a decision concluding that Schultz's statement, "[I]f you're not happy at Starbucks, you can go work for another company," was a coercive threat in violation of Section 8(a)(1) of the NLRA. RE7. In reaching that conclusion, the ALJ applied a purely objective test, asking whether, under the "totality of the circumstances," an employer's speech has "a reasonable tendency to coerce." *Id.* The ALJ dismissed "[i]ntent [a]s immaterial," and stated that "[w]hether the employee subjected to the statement changed their behavior in response is not dispositive, nor is the employee's subjective interpretation of the statement." *Id.*

The ALJ found that it was "irrefutable that Schultz told Hall to quit in response to their exercise of Section 7 rights," observing that "invitations to quit" amount to "implied threats of discharge" under NLRB precedent. *Id.* The ALJ noted Schultz's status as the "legendary leader" of Starbucks and concluded that his statement was a "chilling admonition that Hall's exercise of

protected speech was incompatible with continued employment at Starbucks."
*Id.* The ALJ did not consider any other circumstances, such as the purpose of
the session, the fact that Hall came to the meeting to debate Schultz on the
issue of unions, Hall's continued participation in unionizing efforts, or Schultz's
assurances that the partners would face "no retribution" for "speak[ing] the
truth." ROA.646:3-2.

The ALJ rejected the rest of the complaint, concluding that Starbucks
did not unlawfully interrogate or poll partners about their union support in the
collaboration session and that the environment was not coercive. RE8-9.

The ALJ recommended that Starbucks be ordered to cease and desist,
post a specified notice in stores in the Long Beach area, and read the notice to
all employees in any store that had an employee present at the collaboration
session. RE9.

3. On October 2, 2024, the Board affirmed and adopted the ALJ's
decision. RE1. In doing so, the Board noted that the ALJ correctly applied
"the Board's objective standard for evaluating allegedly coercive statements."
*Id.* It dismissed Starbucks' argument for a subjective test—one requiring
proof that the defendant subjectively understood the threatening nature of his
statements—under *Counterman v. Colorado*, 600 U.S. 66 (2023), as "untimely"

and "waived" and said it would reject a subjective test on the merits.  RE2; *see infra* p. 24 n.5.

The Board observed that it has "long held unlawful employers' statements that employees dissatisfied with working conditions should quit rather than try to improve them through union activity," seemingly as a per se rule.  RE2.  It rejected Starbucks' argument that the ALJ failed to consider relevant context "in deeming the April 8 statement coercive."  *Id.*  The Board observed that the ALJ identified Schultz as the CEO, which "would exacerbate the coercive nature of Schultz's statement."  *Id.*  The Board further remarked that Schultz "demeaned Hall as 'angry' and explicitly denigrated Hall for speaking up about working conditions."  *Id.*  The Board summarily disagreed with Starbucks that Schultz's "assurances against retaliation … lessened the objective tendency of his invitation to quit to have a coercive effect on Hall."  *Id.*

The Board concluded that those circumstances, "set against a back-drop of unfair labor practice litigation arising from [Starbucks'] response to the Union's nationwide organizing, provide[d] ample context for finding Schultz's statement objectively coercive."  *Id.*  The Board did not identify any such "litigation" by name or the outcome of the litigation.  *Id.*

19

The Board modified the ALJ's recommended sanctions to eliminate the requirement that the notice be read aloud in stores but otherwise adopted the ALJ's order.  RE1 n.4.

## SUMMARY OF ARGUMENT

The Board erred in holding that a single comment by Starbucks' interim CEO unlawfully threatened reprisal.  That decision violated Starbucks' statutory and First Amendment rights and flouted Supreme Court precedent.

I.    A.    The Board applied an erroneous legal standard.  In *Counterman v. Colorado*, 600 U.S. 66, 73 (2023), the Supreme Court held that true threats cannot be punished unless the speaker is subjectively aware that the speech is threatening.  A purely objective test, the Court reasoned, unconstitutionally chills protected speech.  The Board here rejected that test and instead asked only whether Schultz's statement would "reasonably tend to coerce," irrespective of Schultz's awareness of whether his speech was threatening.  RE2.  That was error.  If the First Amendment requires proof of subjective awareness to punish even historically unprotected speech like true threats, it necessarily requires such proof to punish employers for speaking with their employees about unions—especially in impromptu conversations like the one here.

B.     Even if *Counterman* does not *require* evidence of an employer's subjective awareness that its speech is threatening, the Board erred in refusing to consider subjective evidence at all.  The Supreme Court, this Court and others have long recognized that an employer's subjective intent and employees' subjective reactions are at least relevant to whether speech objectively tends to coerce.   But the Board declined to consider the overwhelming evidence that Hall was not coerced, and that Schultz was unaware that his statement could coerce.  That too was error.

II.     Under any test, the Board did not prove a coercive threat, as required to establish liability under Section 8(a)(1).  Instead, the Board applied a per se rule divorced from context, holding that sentences like Schultz's are *always* threats.  As this Court has held, however, Section 8(a)(1) liability does not turn on magical phrases but instead requires careful consideration of the entire context.

Even considering only the purely objective evidence, no reasonable employee would have perceived Schultz's rhetorical comment as a threat. Schultz did not communicate an intent to fire Hall.  He did not tell Hall to quit. He did not even say that Hall "should" work for another company—just that they could.  Schultz merely suggested rhetorically that if Hall was not happy

at Starbucks, they could work elsewhere.  In light of that evidence and Shultz's express promise not to retaliate against employees, no threat occurred.

The Board arbitrarily focused on Schultz's comment that Hall seemed angry, but Hall admittedly *was* angry, and employers do not violate the NLRA by making truthful observations about their employees' demeanor.  Schultz made that comment before Hall even raised the subject of unions.  And the Board improperly manufactured its own evidence of reprisal by alluding to a "backdrop" of unproven and unidentified allegations that Starbucks had anti-union animus.

Adding the subjective evidence into the mix only buttresses the conclusion that Schultz did not threaten reprisal.  No evidence showed that partners felt threatened; certainly, Hall did not.  And no evidence showed that Schultz intended to threaten anyone or was aware that his statements were threatening.  The Court should deny enforcement.

## STANDARD OF REVIEW

This Court reviews the Board's legal conclusions de novo.  *Dresser-Rand Co. v. NLRB*, 838 F.3d 512, 516 (5th Cir. 2016).  Whether the First Amendment protects particular speech is a legal question that requires this Court to "conduct[] an independent review of the record both to be sure that the speech

in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within acceptably narrow limits." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 505 (1984); *accord Snyder v. Phelps*, 562 U.S. 443, 453 (2011). Where "the Board's construction of the [NLRA], as applied in this case, poses serious [constitutional] questions," courts must choose a reasonable alternative interpretation that does not raise such concerns. *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575-76 (1988).

This Court reviews the Board's "findings … with respect to questions of fact" for substantial evidence. 29 U.S.C. § 160(e); *see* 5 U.S.C. § 706. "A reviewing court will uphold the Board's decision if it is reasonable and supported by substantial evidence on the record considered as a whole." *Valmont Indus., Inc. v. NLRB*, 244 F.3d 454, 463 (5th Cir. 2001). Substantial-evidence review is not a rubber stamp: "Because the Court is not left merely to accept the Board's conclusions, the Court must be able to conscientiously conclude that the evidence supporting the Board's determination is substantial." *Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 633 (5th Cir. 2003).

The NLRB bears the burden of showing that speech is an unfair labor practice. *DTR Indus. v. NLRB*, 39 F.3d 106, 114 (6th Cir. 1994); *see generally Tschiggfrie Props., Ltd. v. NLRB*, 896 F.3d 880, 886 (8th Cir. 2018).

## ARGUMENT

The Board erred in concluding that Starbucks interim CEO Howard Schultz unlawfully threatened reprisal when he rhetorically stated, "[I]f you're not happy at Starbucks, you can go work for another company."  Those thirteen words, which comprised only three seconds of a nearly three-hour conversation, were not a threat of reprisal.  This Court thus should set aside the Board's order and deny the Board's request for enforcement.

## I.    The Board Applied Incorrect Legal Standards that Unconstitutionally Restrict Employers' Protected Speech

### A.    Subjective Awareness of the Threatening Nature of Speech Is Required To Impose Liability

"From 1791" onwards, the First Amendment has prohibited the government from placing "restrictions upon the content of speech," except for "a few limited areas." *Counterman v. Colorado*, 600 U.S. 66, 73 (2023) (citation omitted). [5]  That First Amendment protection extends to employers' "right …

---

[5] The Board's conclusion that Starbucks waived an argument based on *Counterman* cannot foreclose review of the argument in this Court.  Section 10(e) of the NLRA specifies that a party need only urge an issue "before the Board" for a court to consider it.  29 U.S.C. § 160(e).  As the Board admitted,

to engage in noncoercive speech about unionization," whether that speech involves expressing opinions, asking questions, or two-way dialogue with employees or others. *Brown*, 554 U.S. at 67.

Congress in the NLRA did not just "implement[] the First Amendment." *Id.* (citation omitted). Congress expressly protected employers' and unions' right to "express[] … any views, argument, or opinion" in any form, which "shall not constitute or be evidence of an unfair labor practice … if such expression contains no threat of reprisal or force or promise of benefit," 29 U.S.C. § 158(c), in order to "encourage free debate on issues dividing labor and management." *Brown*, 554 U.S. at 67 (citation omitted). Without a threat or promise, "§ 8(c) unambiguously protects '*any* views, argument, or opinion'—even those that the agency finds misguided, flimsy, or daft." *Trinity Servs. Grp., Inc. v. NLRB*, 998 F.3d 978, 980 (D.C. Cir. 2021) (quoting 29 U.S.C. § 158(c)).

---

Starbucks explicitly objected to the Board's purely objective test in its exceptions, ROA.79 ¶ 21, and argued that *Counterman* requires a subjective test in its brief in support of those exceptions, Exceptions Br. 21. Starbucks thus properly preserved that issue for this court's review. *See Thryv, Inc. v. NLRB*, 102 F.4th 727, 741 (5th Cir. 2024).

Congress considered such speech so "important" that Congress "suffuse[d] the NLRA as a whole" with "policy judgment[s]" that "uninhibited, robust, and wide-open debate in labor disputes" and "freewheeling use of the written and spoken word" should be vigorously protected. *Brown*, 554 U.S. at 67-68 (citation omitted). Even "vehement, caustic, and sometimes unpleasant sharp attacks are protected." *Linn v. United Plant Guard Workers*, 383 U.S. 53, 62 (1966). When it comes to restricting employers' speech or dialogue about unionization, ordinary First Amendment guardrails thus apply.

In *Counterman,* the Supreme Court clarified those guardrails for a historically unprotected category of speech: true threats of violence. 600 U.S. at 77-78. A true threat of violence is a statement "that when taken in context … convey[s] a real possibility that violence will follow." *Id.* at 74. Historically, whether a statement constituted a "true threat" depended "solely on its objective content." *Id.* at 72. Counterman argued, however, that the First Amendment further requires proof "that the defendant was aware in some way of the threatening nature of his communications" to impose liability. *Id.* The Supreme Court agreed. *Id.* at 73.

The Court observed that its First Amendment "precedent" has "often insisted on protecting even historically unprotected speech through the

26

adoption of a subjective mental-state element." *Id.*; *see also, e.g.*, *id.* at 76 (discussing defamation precedent); *id.* at 76-77 (discussing obscenity and incitement to unlawful conduct precedent). The Court explained that the requirement to prove a subjective mental state protected against the "self-censorship" that would result from speakers' fear of "the uncertainties and expense of litigation." *Id.*

The Court concluded that a subjective mental-state requirement applied equally in the context of true threats of violence. *Id.* at 77-78. A purely objective standard, the Court observed, would "chill[] non-threatening expression, given the ordinary citizen's predictable tendency to steer 'wide[] of the unlawful zone.'" *Id.* (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)). And it thus would "discourage the uninhibited, robust, and wide-open debate that the First Amendment is intended to protect." *Id.* at 78 (citation omitted).

As a result, the Court in *Counterman* adopted an additional, subjective standard. 600 U.S. at 73. That standard requires the government to prove not only that a reasonable person would consider the statement to be threatening, but also that "the defendant had some understanding of his statements' threatening character." *Id.* In other words, to impose liability for true threats,

the First Amendment imposes both objective and subjective requirements. *Id.*

That subjective requirement should apply with full force here too. If the government cannot restrict even traditionally low-value speech, like true threats, without that guardrail, then the government surely cannot restrict employers' speech about unionization without meeting the same prerequisite. Nothing about the labor context requires application of different First Amendment principles; the Supreme Court already has applied the mental-state requirements governing defamation law in the labor context. *See Linn*, 383 U.S. at 63 ("the most repulsive speech enjoys immunity provided it falls short of a deliberate or reckless untruth").

The exact same chilling concerns that motivated the Court's adoption of the mental-state requirement in *Counterman* warrant extending the requirement to this context. The First Amendment not only protects employer speech about unionization, but Congress expressly codified that protection to encourage "uninhibited, robust, and wide-open debate" between employers and employees. *Brown*, 554 U.S. at 67-68; *supra* p. 26. Imposing liability on employers for their speech absent their awareness that reasonable employees would view the speech as threatening will stifle that important

debate.  Employers will have no choice but to "stay wide[] of the unlawful

zone." *Counterman*, 600 U.S. at 75 (citation omitted).

## B.    Subjective Evidence Is At Least Relevant to Whether Employer Speech Tends To Coerce

To be sure, this Court has previously stated the applicable test in

objective terms—*i.e.*, as whether "threats or statements tend to be coercive,

not whether the employees are in fact coerced." *Brown & Root*, 333 F.3d at

634.  That test seemingly conflicts with the statutory text, which makes it an

unfair labor practice to "interfere with, restrain, or *coerce* employees in the

exercise of the rights" guaranteed by NLRA Section 7, 29 U.S.C. § 158(a)(1)

(emphasis added), but this Court and the Board have long stated the test in

objective terms.

Even if the objective standard survives *Counterman*, and it does not,

subjective evidence is at least relevant to the objective inquiry—that is, to

whether a reasonable employee would consider an employer's statement "a

threat of retaliation." *See Gissel Packing*, 395 U.S. at 618-19.  Whether

employer speech threatens reprisal "is not viewed in a vacuum." *FDRLST

Media v. NLRB*, 35 F.4th 108, 122 (3d Cir. 2022).  Rather, "an employer's

conduct must be examined in light of *all* the existing circumstances." *Id.*

(cleaned up).

As in other contexts, those circumstances may include objective considerations such as the words themselves, their timing, how and when they were delivered, by whom, and in what workplace conditions. *Brown & Root*, 333 F.3d at 634; *accord FDRLST Media*, 35 F.4th at 127; *Hendrickson USA, LLC v. NLRB*, 932 F.3d 465, 476-77 (6th Cir. 2019). But they may also include "subjective impressions," which can "sometimes be helpful" in determining "how a reasonable employee would objectively view her employer's conduct." *FDRLST*, 35 F.4th at 124.

The Supreme Court, this Court, and others have often considered employees' subjective impressions to be relevant. In *Gissel Packing*, the Supreme Court's seminal decision addressing Section 8(c)'s protection of employer speech, the Court recognized the Board's duty to "focus on the question" of what did "the listener understand?" *Id.* at 619 (citation omitted). And, in upholding the Board's decision in that case, the Court looked to the Board's assessment of "the intended and *understood* import" of the employer's message. *Id.* (emphasis added). Thus, in *DeBartolo*, the Supreme Court held that the NLRB unlawfully penalized a union for picketing and distributing handbills because there was "no suggestion the leaflets had any coercive effect on customers" of the picketed mall. 485 U.S. at 578.

Similarly, in *FDRLST Media*, the Third Circuit deemed the "subjective interpretations" of employees "especially helpful" in a case where "the employer claim[ed] his statement" was a joke. *FDRLST*, 35 F.4th at 124. There, the executive officer of a "right-leaning internet magazine" tweeted "FYI @fdrlst first one of you tries to unionize I swear I'll send you back to the salt mine." *Id.* at 113. After an individual unaffiliated with the magazine filed a charge, the General Counsel initiated proceedings and the Board concluded that the tweet violated Section 8(a)(1). *Id.* at 113-14.

In denying enforcement, the Third Circuit applied the objective standard discussed above. *See id.* at 122. But the court nonetheless criticized the Board for failing to consider the lack of subjective evidence that any "employees perceived" the employer's statement as a "veritable threat," which the court characterized as a "noteworthy gap in the record." *Id.* at 125-26. As the court of appeals explained, "employees' subjective responses can be relevant to determining whether a reasonable employee—who is familiar with her employer and the context of a remark— would tend to be coerced." *Id.* Other circuits have held the same. *Id.* at 124-25 (surveying cases).

So too in this Circuit. While this Court has stated that the objective analysis is not "contingent on" subjective factors, *Renew Home Health v.*

*NLRB*, 95 F.4th 231, 242 (5th Cir. 2024), it has never held that subjective reactions or impressions are *irrelevant*.[6] In *Federal-Mogul Corp. v. NLRB*, 566 F.2d 1245, 1253 (5th Cir. 1978), for example, the Board concluded that a supervisor interfered with a union election in violation of Section 8(a)(1) when he burned a union campaign card while bantering with employees. This Court disagreed. It concluded that because the employees and supervisor were engaged in "horseplay" that involved "teasing," and that one employee had "snickered" and "laughed" when the incident occurred, it was "obvious that the entire incident was a joke." *Id.* This Court further warned that "[t]he incident" should not "be taken out of context," and "must be considered along with all of the facts and circumstances existing at the time." *Id.*

Similarly, the Board cannot ignore the speaker's subjective intent, which is part of the totality of circumstances informing the objective inquiry. The Supreme Court has long instructed the Board to "focus on the question:

---

[6] In *Renew Home Health*, the Court stated that the objective analysis is not "contingent on" a statement's "actual effect," 95 F.4th at 242, but elsewhere stated in dicta that "the fact that [the employee] continued to discuss workplace issues with her co-workers after receiving the alleged threat is irrelevant under our jurisprudence," *id.* at 243. That latter dicta confuses the standard for liability with relevance. As the Third Circuit explained in *FDRLST Media*, "We have held that employees' subjective impressions are *not dispositive*; not that they are *irrelevant*." 35 F.4th at 124.

32

"[W]hat did the speaker intend[?]" *Gissel Packing*, 395 U.S. at 619 (citation omitted).    Coercive speech, according to the Supreme Court, involves "*conscious* overstatements [the employer] has reason to believe will mislead his employees." *Id.* at 620 (emphasis added).

This Court also considers the speaker's intent relevant.    In *NLRB v. Kaiser Agricultural Chemicals, Division of Kaiser Aluminum & Chemical Corp.*, 473 F.2d 374 (5th Cir. 1973), for example, this Court considered "what the employer intended to imply" in determining whether a statement was a threat.    *Id.* at 381.    Similarly, in *Chromalloy Mining. & Minerals Alaska Division, Chromalloy American Corp. v. NLRB*, 620 F.2d 1120 (5th Cir. 1980), this Court considered whether "the Board could reasonably conclude that the *intended and understood* import of [a] message" was to threaten employees. *Id.* at 1124 (emphasis added).    And in *NLRB v. Amoco Chemicals Corp.*, 529 F.2d 427 (5th Cir. 1976), this Court considered whether the employer "intended to communicate any implication" that an employee's salary would be unilaterally lowered.    *Id.* at 430.    Both an employer's subjective intention and an employee's subjective reaction are relevant considerations even if the relevant standard is an objective one.

## II.    Schultz's Statement Was Not an Unlawful Threat of Reprisal

Under any standard, the Board erred in concluding that Schultz's statement threatened reprisal.  The First Amendment and NLRA Section 8(c) protect and indeed encourage honest debate between CEOs and their employees.  Starbucks prides itself on encouraging its partners to speak their minds.  Schultz met with partners to foster an honest and open conversation.  And when a partner hijacked the conversation and suggested that they did not like working at Starbucks, Schultz simply observed that if they did not like working at Starbucks, they could work elsewhere—one line in a nearly three-hour meeting that included assurances against retaliation, did not contradict those assurances, and did not chill further discussion of unions at and after the collaboration session.  If that on-the-fly reaction violates the NLRA, then employers will have to avoid participating in the robust debate that Section 8(c) was intended to foster.  The Board's contrary conclusion unconstitutionally punishes employer speech, misunderstands the record evidence, and ignores the full context of the conversation.

### A.    A Reasonable Employee Would Not Consider Schultz's Statement a Threat of Reprisal

This Court should vacate the Board's order because, even looking at objective evidence alone, a reasonable employee would not view Schultz's

statement as a "threat or implied threat of discharge." RE7. A threat is a "communicated intent to inflict harm or loss on another." *Threat*, Black's Law Dictionary (12th ed. 2004). Threats convey that an employer will "deliberately inflict" reprisals in response to an employee's protected activity—*i.e.*, "to return evil for evil." *Crown Cork & Seal Co. v. NLRB*, 36 F.3d 1130, 1138 (D.C. Cir. 1994) (citation omitted); *see also FDRLST Media*, 35 F.4th at 122 (an employer's statement must warn of adverse consequences in a way that "would tend to coerce a reasonable employee not to exercise her labor rights") (internal quotation marks omitted)). Examples of *actual* retaliatory threats include telling employees that a plant will close if the union succeeds, *NLRB v. Bogart Sportswear Mfg. Co.*, 485 F.2d 1203, 1205 (5th Cir. 1973), promising legal action against employees who file charges with the Board, *Quickway Transportation, Inc. v. NLRB*, 117 F.4th 789, 813 (6th Cir. 2024), and conveying that employees will be demoted if they choose to pursue union activities, *AutoNation, Inc. v. NLRB*, 801 F.3d 767, 774 (7th Cir. 2015).

Schultz's impromptu statement, in response to a partner's angry comments at a collaboration session, was not a threat. Schultz said only to Hall, "[I]f you're not happy at Starbucks, you can go work for another company." ROA.655:7-13. He did not "communicate an intent" to discharge

or fire Hall.  Nor did Schultz "tell Hall to quit" or request Hall's resignation. Schultz did not even say that Hall "should" work for another company—just that they could.  *Id.*  And Schultz certainly did not convey that Starbucks would "deliberately inflict" any other sort of adverse consequence on Hall, nor tie such consequence to their union activity.  Schultz merely suggested that if Hall was not happy at Starbucks, they could work elsewhere.  That rhetorical, reasonable observation was no threat.

The Board concluded that Schultz's statement was a "threat of discharge," RE7, because the Board has "long held unlawful employers' statements that employees dissatisfied with working conditions should quit rather than try to improve them through union activity."  RE2.  But Schultz did not tell Hall that they "should quit" rather than try to improve conditions through union activity; the at-issue statement said nothing about unions.  And that bright-line rule violates this Court's precedent.  "There are no magical phrases the mere incantation of which are coercive and therefore violate § 8(a)(1)."  *Exxon Rsch. & Eng'g Co. v. NLRB*, 89 F.3d 228, 233 (5th Cir. 1996). Instead, whether a statement is coercive "depends upon the context in which it is uttered," which includes the presence or absence of other "contemporaneous threats or unfair labor practices."  *Id.*

Based on the objective evidence of the surrounding context, which the Board ignored or summarily dismissed, no reasonable employee would have considered Schultz's statement to coercively threaten. Critically, Schultz opened the conversation by assuring partners that they would not "get in trouble" or face "retribution" for sharing their thoughts. ROA.646:1-2. As Hall testified, Schultz also expressed empathy towards the partners throughout the conversation. ROA.80:1, 222:6-10.

Importantly, Schultz did not seek to elicit information from partners about unions or union activity. Unions were only part of the in-person conversation because Hall, armed with a binder of notes, repeatedly brought up union charges, even after Schultz delicately tried to change topics. And when Hall raised the subject of unionization, Schultz did not tell Hall to quit or find a new job. He merely observed, in response to Hall's angry questioning, that Hall may be happier working elsewhere. ROA.655:7-13. Schultz did not yell, raise his voice, or impede Hall's personal space. The statement spanned only two seconds over a nearly three-hour conversation. Schultz even affirmed partners' right to organize in the same conversation. ROA.663:25, 664:1. Those are not the indicia of a threat to *retaliate*.

The Board ignored all those circumstances, instead cherry-picking one sentence from its full context and improperly relying on two additional findings to support its conclusion: that Schultz was the "legendary leader" of Starbucks and that Schultz "demeaned Hall as angry." RE2. The Board's reliance on those factors illustrates the extent to which it had to stretch to reinforce its conclusion. The Board did not explain how Schultz's status at Starbucks turned his mere suggestion into a coercive threat; if anything, his status gave even greater weight to his promise not to retaliate and his recognition that partners have the right to unionize.

Nor did the Board explain how Schultz's supposed demeaning or denigration of Hall turned his comments into a threat of reprisal. The Board first commented that Schultz "subtly demeaned Hall as 'angry.'" RE2. But any objective observer would have concluded that Hall was angry. *See generally* ROA.670. And Hall was in fact angry—they admitted so at the hearing before the ALJ. ROA.663:23-25. Importantly, Schultz offered the observation that Hall seemed angry *before Hall even raised the subject of unions*. He asked in good faith *why* Hall was angry. ROA.654:13-14. Schultz's true, protected observation that Hall seemed angry does not turn his later, otherwise innocuous statement into an unlawful threat.

The Board similarly asserted that Schultz "denigrated Hall for speaking up about working conditions and the Union despite having only two years of seniority." RE2. But the evidence does not support that assertion. Schultz did not denigrate Hall for speaking up about working conditions and the Union. He called out Hall's disrespectful *manner of speaking* in the collaboration session. At that point in the conversation, Hall had already spoken sarcastically and in anger: ROA.654:15-16. Trying to foster a productive, positive conversation, Schultz explained that he wanted to have a "transparent" and "honest" dialogue and urged, "I would just ask you to have a little bit more respect for the people who have been here more … years than you." ROA.655:7:13.

It was at the end of this attempt to redirect the conversation from Hall's (admitted) anger, sarcasm, and jibe about honesty that Schultz commented about Hall's freedom to work for another company. His comment was directly tied to Hall's apparent anger at the company. And that is how Hall took Schultz's comment in the moment, responding that they did not hate the company and listing things they loved but also things they wanted to change. ROA.658:14-16.

Schultz's comment was not a threat against unionizing but rather a protected expression of opinion defending Starbucks' competitive benefits and wages from Hall's criticisms.

Even if the comment "denigrated" or blamed Hall, such speech was protected. Section 8(c) prohibits only "threats" and "promises," not hurting someone's feelings. Without a threat or promise, Section 8(c) "unambiguously protects 'any views, argument, or opinion'—even those that the agency finds, misguided, flimsy, or daft." *Trinity Services*, 998 F.3d at 980; *see also id.* ("assigning blame" "evoke[s] no future consequences" and is thus protected by Section 8(c)). Schultz's comment, even if denigrating, was protected opinion.

The Board also criticized Schultz for supposedly being angry. But that was Hall's characterization of Schultz, RE6, not reality. No objective observer would have viewed Schultz as angry. The video shows that Shultz remained calm while Hall attacked Starbucks for its pay and benefits. Schultz did not raise his voice, curse, or wag his finger. ROA.670 at 5:49-51. He calmly engaged in the "robust and wide-open debate" protected and encouraged by the First Amendment. *Brown*, 554 U.S. at 68. Employers may permissibly debate the benefits of unions with employees. They may even do so in

"caustic" or "unpleasant" terms, although Schultz did not. *Linn*, 383 U.S. at 62. The NLRA does not protect employees from difficult conversations; it is not a happy-talk code. It simply protects employees from threats of reprisal for their Section 7 protected activity. Schultz never threatened Hall.

The Board also failed to explain why Schultz's assurances against reprisal—which he was not required to give but gave anyway—did not lessen the supposed "objective tendency of his statement" to coerce, when courts and the Board acknowledge that such assurances undercut any implication that an employer-employee conversation was unlawful. *E.g.*, *Delco-Remy Div. v. NLRB*, 596 F.2d 1295, 1311 (5th Cir. 1979); *Tschiggfrie Props.*, 896 F.3d at 888; *Sunbelt Rentals, Inc.*, 372 NLRB No. 24, at 5 (2022).

Critically, Schultz made the statement "in circumstances free from other unfair labor practices." *Exxon Rsch.*, 89 F.3d at 233. The Board did not find that any other action or statement in the session constituted a threat, and the ALJ (adopted by the Board) expressly concluded that no other coercive practices occurred in the session. *Supra* p. 18. This absence of evidence of any other unfair labor practices explains why the Board felt compelled to invoke what it called "a backdrop of unfair labor practice litigation arising from Respondent's response to the Union's nationwide organizing" to prop up its

41

conclusion of coercion.  RE2.  According to the Board, Schultz's status as the CEO and his supposed demeaning of Hall—"set against" this "backdrop" of "litigation"—"provide[d] ample context for finding Schultz's statement objectively coercive."  RE2.  This was error.

The Board did not identify that litigation, state whether it was referencing final adjudications, or explain how their facts relate to this case. It appears the Board may have been referring to litigation pending before the Board itself, because elsewhere it said that "the Board may take administrative notice of its own proceedings."  ROA.799.  But the Board cannot fairly infer animus from the mere filing of complaints in the Board or from an employer's decision to exercise its right to defend itself in Board litigation.

Even if the Board could infer anti-union animus from its own decisions irrespective of whether they have been enforced, and it cannot, the Board did not identify which decisions it was referencing or address whether they have any bearing on this case.  The General Counsel's brief to the Board identified only four Board decisions.  ROA.802 n.44.  The Board did not identify any evidence that Schultz, who had returned to Starbucks *only four days earlier*, was involved in the underlying events or even knew of those decisions.  Nor did the Board explain how four decisions arising from a handful of stores—

42

when viewed against the backdrop of Starbucks' many thousands of stores—proves widespread animus, or how any supposed animus turned Schultz's innocuous remark into a threat of future retaliation.

This case perpetuates the Board's trend of invoking Board litigation against employers to brand them as anti-union in order to prop up other baseless Section 8(a)(1) violations.  *See, e.g.*, *Starbucks Corp. v. NLRB*, 373 NLRB No. 33, at 1 n.2 (2024).  This Court should put an end to that pernicious cycle.

## B.     The Subjective Evidence Confirms That No Threat of Reprisal Occurred

Independently, enforcement should be denied because the subjective evidence—which the agency completely ignored—confirms that no reasonable employee would understand Schultz's comment to be a threat of reprisal.  As discussed above, evidence of employees' subjective reactions and employers' intent is at least *relevant* to determining whether speech tends to coerce. *Supra* p. 29.

No evidence shows that Hall or any other Starbucks partner felt threatened or chilled in any way.  To the contrary, after the alleged threat, Hall continued to advance their disagreement with Schultz about unions, despite Schultz's effort to redirect the conversation away from the subject,

ROA.660:5-15, and to keep the peace at a meeting about collaboration in the face of questioning by an angry partner.

Hall did not retreat, leave, or stop sharing ideas. *Id.* To the contrary, once the session was over, Hall joined a group of others gathered outside and distributed union propaganda. ROA.229:1-4, 232:13-15. Hall also created TikTok videos about their interaction with Schultz that were later posted on the Union's website. ROA.153:13-21, 154:3-23.

Although the ALJ asserted that Schultz's statement sent the "chilling message that Hall's advocacy of the Union was incompatible with continued employment with Starbucks," RE7, Hall apparently did not get that message. Hall continued their employment with Starbucks following the session and attempted to unionize their store, ending their employment only after their store voted against unionization. ROA.61:16-23, 63:3-7. That is not the behavior of an employee who felt their job was threatened by their union support or was incompatible with union support. It is instead compelling evidence that Schultz did not threaten reprisal.

Nor is there any evidence that other partners felt coerced or threatened. After Schultz's comment to Hall, other partners continued sharing their thoughts and ideas. One partner shared that he thought the purpose of the

collaboration session was "the desire to be better, not just the company, but us as a group." ROA.655:22-23. Another partner shared that she "had a child because of Starbucks." ROA.661:3-4. And other partners joked about the "regular customers" at their stores. ROA.667:12-18. Multiple partners also stayed around after the session to take pictures and chat with Schultz. ROA.228:15-21. These are likewise not the reactions of employees who felt threatened.

That evidence is certainly probative of whether a reasonable employee— "who is familiar with her employer and the context of a remark"—"would tend to be coerced." *FDRLST*, 35 F.4th at 125. If no partner, including the one to whom Schultz's statement was directed, felt deterred from speaking or engaging in other protected activity, that evidence is "helpful" in determining "how a reasonable employee would objectively view her employer's conduct." *Id.* at 124. The lack of any evidence of actual coercion was a "noteworthy gap in the record" that the Board "failed to even acknowledge." *Id.* at 125. That lack of evidence, combined with all the objective evidence discussed above that the Board simply ignored, requires this Court to deny enforcement. *Id.*

The Board's order is independently untenable because the agency refused to consider whether Schultz intended his statement as a threat. As

discussed, the Supreme Court, this Court, and others have repeatedly considered an employer's subjective mental state as relevant in determining whether speech constitutes an unlawful threat of economic reprisal. *Gissel Packing*, 395 U.S. at 619; *supra* pp. 32-33. Yet the Board and ALJ categorically refused to consider such evidence. RE2, 7.

That failure is particularly harmful here because no evidence shows that Schultz intended or even knew that his single statement during an almost three-hour conversation could be viewed as threatening or coercive. Just the opposite. No evidence showed that Schultz attended the collaboration session to threaten union supporters with discharge; as already discussed, he assiduously attempted to avoid discussing unionization. His stated purpose for attending the session was to "listen very carefully to the most important people in the Company," and to "really kind of understand what we need to make things better for" the partners. ROA.645:7-9, 646:2-3. Schultz emphatically encouraged the partners to tell him "what the experience is like day in and day out, what needs to be improved, what needs to be addressed." ROA.645:21-25. He even acknowledged that Starbucks had "some work to do," ROA.646:4, and affirmed that partners have "the right to organize," ROA.663:25.

Most importantly, Schultz said that "the worst thing that could happen" was if the partners left the session without "speak[ing] the truth," and assured them that they would not "get in trouble" or face "retribution" for sharing their thoughts and ideas. ROA.646:1-2. That is not the mindset of an employer threatening to discharge its employees for supporting unionization.

## C. No Evidence Proved That Schultz Had a Culpable Mindset

Finally, the Board's conclusion that Schultz threatened reprisal is independently untenable under *Counterman*, discussed above, because no evidence shows that Schultz subjectively understood his statement as threatening, as required by the First Amendment. *See* 600 U.S. at 74.

The circumstances here epitomize the reasons for applying *Counterman*'s speech-protective guardrails in the context of employer speech. Hall hijacked the collaboration session to confront Schultz, who had been back on the job for four days, with claims of unfair labor practices. Schultz responded on the fly, expressing empathy for partners, promising not to retaliate, and reaffirming partners' right to unionize—exactly what a CEO should do in that circumstance. And yet Starbucks finds itself embroiled in years of litigation over one sentence, and, if the decision is enforced, the Board will surely seize on this one sentence as future evidence of Starbucks' supposed

anti-union animus.  Unless *Counterman* protects against this outcome, the Board's runaway application of the NLRA to punish employer speech will chill lawful speech that Congress protected in Section 8(c).  This Court should deny enforcement.

## CONCLUSION

This Court should set aside the NLRB's order and deny the NLRB's application for enforcement.

Dated: 03/31/2025                    Respectfully submitted,

JEFFREY S. HILLER                    /s/ Lisa S. Blatt
LITTLER MENDELSON, P.C.              LISA S. BLATT
  41 S. High St., Ste. 3250          AMY MASON SAHARIA
  Columbus, OH 43215                TYLER BECKER
                                     ALEXA DEN HERDER
JONATHAN O. LEVINE                   WILLIAMS & CONNOLLY LLP
LITTLER MENDELSON, P.C.                680 Maine Avenue, S.W.
  1111 E. Kilbourn Ave., Ste. 1000     Washington, DC 20024
  Milwaukee, WI 53202                 (202) 434-5000
                                       lblatt@wc.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2025, I electronically filed the foregoing document with the United States Court of Appeals for the Fifth Circuit by using the appellate NextGen system. I certify that all participants in the case are registered NextGen users and that service will be accomplished by the appellate NextGen system.

Dated: 03/31/2025       /s/ *Lisa S. Blatt*
                  LISA S. BLATT

# CERTIFICATE OF COMPLIANCE

I certify, pursuant to Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, that the attached Brief of Petitioner/Cross-Respondent contains 9,342 words and complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word 2019, in 14-point CenturyExpd BT.

Dated:  03/31/2025                         /s/ *Lisa S. Blatt*
                                           LISA S. BLATT